# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

SHERRY A. BANKS,                                        Case No. 1:14-cv-691
      Plaintiff,                                       Beckwith, J.
                                                       Litkovitz, M.J.

      vs.

COMMISSIONER OF                                        **REPORT AND**
SOCIAL SECURITY,                                       **RECOMMENDATION**
      Defendant.

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB). This matter is before the Court on plaintiff's Statement

of Errors (Doc. 7) and the Commissioner's response in opposition (Doc. 10).

## I. Procedural Background

Plaintiff filed her application for DIB in September 2011, alleging disability since July

29, 2011, due to fibromyalgia, multiple joint arthritis, degenerative disc disease, lumbar spine

impairment, severe back pain, headaches, and anxiety. These applications were denied initially

and upon reconsideration. Plaintiff, through counsel, requested and was granted a *de novo*

hearing before administrative law judge (ALJ) Elizabeth A. Motta. Plaintiff and a vocational

expert (VE) appeared and testified at the ALJ hearing. On July 19, 2013, the ALJ issued a

decision denying plaintiff's DIB application. Plaintiff's request for review by the Appeals

Council was denied, making the decision of the ALJ the final administrative decision of the

Commissioner.

## II.  Analysis

### A.  Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.   42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.   42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled.   If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)).   The claimant has the burden of proof at the first four steps of the sequential evaluation process.   *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541,

2

548 (6th Cir. 2004).   Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy.   *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

### B.    The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2016.

2. The [plaintiff] has not engaged in substantial gainful activity since July 29, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The [plaintiff] has the following severe impairments: fibromyalgia and depression (20 CFR 404.1520(c)).

4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526).

5.   After careful consideration of the entire record, [the ALJ] finds that the [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) subject to the following limitations: lift up to 20 pounds occasionally and 10 pounds frequently; standing and walking limited to combined total of four hours in an eight-hour workday; only occasional postural activities, such as climbing stairs/ramps, balancing, stooping, kneeling, crouching or crawling; no climbing ropes, ladders or scaffolds; no exposure to hazards, such as moving or dangerous machinery or working at unprotected heights; simple, repetitive tasks; and low stress work with no strict production quotas or fast pace.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).[1]

---

[1]Plaintiff's past relevant work was as a MDS coordinator, a light, skilled position; and a licensed practical nurse (LPN), a medium, skilled position.   (Tr. 28, 57-59).

7. The [plaintiff] was born [in] . . . 1970 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a)).[2]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from July 29, 2011, through the date of this decision (20 C.F.R. 404.1520(g)).

(Tr. 21-30).

### C.   Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards.   *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229

---

[2]The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of 9,500 regional jobs and 808,000 national jobs at the light exertion level and 5,800 regional jobs and 493,000 national jobs at the sedentary exertion level, such as charge account clerk, food order clerk, and wire insulator.   (Tr. 29, 60-62).

(1938)).   Substantial evidence consists of "more than a scintilla of evidence but less than a

preponderance. . . ."   *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).   In

deciding whether the Commissioner's findings are supported by substantial evidence, the Court

considers the record as a whole.   *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the

disability determination.   Even if substantial evidence supports the ALJ's conclusion that the

plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails

to follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right."   *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

*See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was

otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving

weight to treating physician's opinion, thereby violating the agency's own regulations).

**D.   Specific Errors**

Plaintiff raises two assignments of error on appeal.   First, plaintiff argues the ALJ erred

in weighing the opinions of her treating physician, Jeffrey Jarrett, M.D., and her treating

counselor, June Nelson, LISW, LPCC.   Second, plaintiff contends the ALJ erred in assessing her

credibility.

1. Whether the ALJ erred in weighing the opinion evidence of record.

The applicable regulations set forth three types of acceptable medical sources upon which

an ALJ may rely: treating source, nontreating source, and nonexamining source.   20 C.F.R. §§

404.1502, 416.902.   When treating sources offer opinions, the Social Security Administration is

to give such opinions the most weight and is procedurally required to "give good reasons in [its]

notice of determination or decision for the weight [it gives the claimant's] treating source's opinion." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6) in determining what weight to give the opinion. *See Gayheart,* 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(c)(2)(i)(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(3)-(6); *Gayheart,* 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

The opinion of a non-treating but examining source is entitled to less weight than the opinion of a treating source, but is generally entitled to more weight than the opinion of a source who has not examined the claimant. *Ealy*, 594 F.3d at 514. *See also Smith,* 482 F.3d at 875. When deciding the weight to give a non-treating source's opinion, the ALJ should consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). Because a non-examining source has no

6

examining or treating relationship with the claimant, the weight to be afforded the opinion of a non-examining source depends on the degree to which the source provides supporting explanations for his opinions and the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources.  *Id.*

    *a. Weight to the opinions of treating physician Jarrett and the state agency consultants*

Dr. Jarrett has been plaintiff's treating family physician since 1999.  (Tr. 291).   In 2008 and 2009, when plaintiff was still working as a nurse, she experienced an increase in low back, hip, neck, and shoulder pain.  (Tr. 278-79, 289-80, 287, 310).   Plaintiff was treated with Percocet, Celebrex, Flexeril, and physical therapy, which was subsequently discontinued per the therapist's advice because plaintiff had "too much discomfort and too much difficulty with her doing therapy with increased pain."  (Tr. 279).

On May 23, 2010, plaintiff reported increased pain "all over" with tightness in the neck and upper back, difficulty sleeping, and irritable mood.  (Tr. 277).   Examination revealed "a lot of muscle tenderness in the upper back, arms, [and] chest" and Dr. Jarrett diagnosed myalgias, arthralgias, fatigue, and scapular pain and noted that "[f]ibromyalgia comes to mind as [a] strong possibility."  (*Id.*).   In July 2010, plaintiff reported that she was "not doing well at all" due to chronic pain.  (Tr. 275).   She reported an extreme adverse reaction to taking Lexapro for a month, relating that her husband "found her crawling on all fours, screaming and banging her head on the wall."  (*Id.*).   Plaintiff stopped taking Lexapro and had no further problems.  (*Id.*).   On examination, plaintiff had poor range of motion and a lot of back tenderness.   Dr. Jarrett diagnosed chronic headache and chronic back pain causing significant depression.  (*Id.*).

7

        In October 2010, plaintiff treated with Matthew Hodges, D.O., of the Orthopaedic

Institute of Dayton, and reported "multiple pain complaints."   (Tr. 308-09).   Plaintiff reported

that her primary complaint was low back pain radiating into both hips, greater on the left.   (Tr.

308).   On examination Dr. Hodges found "15 out of 18 tender points diagnostic with two

negative control points for the criteria for fibromyalgia."   (*Id*.).   Dr. Hodges also found 5/5

strength in all extremities, well preserved reflexes, and diffuse tenderness even to light touches,

"almost hyperalgesic."   He noted that plaintiff was tearful on two occasions during the

interview.   (*Id*.).   Dr. Hodges diagnosed fibromyalgia syndrome with attendant multiple aches

and pains, chronic opiate therapies, and likely overlay of depression.   (Tr. 309).

        In November 2010, Dr. Hodges found tenderness on palpation across plaintiff's trapezius

and rhomboids and he provided some gentle range of motion and myofascial release which

plaintiff tolerated quite well.   (Tr. 307).   December 2010 treatment notes reflect similar findings

and treatment and plaintiff was advised to begin a regular walking, cycling, or pool exercise

program.   (Tr. 306).   In January 2011, plaintiff reported a recent flare up of her fibromyalgia.

(Tr. 305).   Plaintiff had 5/5 strength throughout the lower extremities, symmetric reflexes at the

patella, tenderness on palpation across her lumbar paraspinals, and some limited passive joint

play in the lumbosacral spine.   (*Id*.).   Dr. Hodge's recommended physical therapy for

myofascial release with the goal of moving into a progressive cardiovascular program to address

plaintiff's fibromyalgia symptoms.   (*Id*.).   She was continued on her current medication regime

of Cymbalta, Relafen, Ultram.   (*Id*.).

        When seen by Dr. Jarrett on February 8, 2011, plaintiff reported increasing back and hip

pain and mood problems due to pain and stress.   Dr. Jarrett noted that plaintiff had been seeing

Dr. Hodges without much improvement.   On examination, Dr. Jarrett found decreased range of motion of the back with extension and pain on extreme range of motion in all directions; tenderness of the left hip above the greater trochanter; some tenderness in the lower back area; and tenderness of the right paraspinal scapular area.   Plaintiff was tearful when discussing her mood.   Dr. Jarrett diagnosed muscular scapula pain, chronic low back pain, left hip pain, and depression.   Dr. Jarrett added Abilify to her regimen of Tramadol and Ultram.   (Tr. 273).

A February 9, 2011 MRI of plaintiff's pelvis showed mild degenerative changes and no acute bony abnormalities of the lumbar spine.   (Tr. 285-86)

On April 8, 2011, plaintiff reported that her pain had increased and that she was missing more work and having problems sleeping.   Her examination was "unchanged" with evidence of "a lot" of tenderness in the back, shoulders, and chest.   Dr. Jarrett diagnosed chronic back pain and prescribed a new sleep aid medication.   (Tr. 272).

On August 10, 2011, Dr. Jarrett wrote a letter and reported that he treated plaintiff for chronic low back pain, fibromyalgia, chronic left hip pain, and depression.   Dr. Jarrett wrote that due to her "diagnoses, and progressive and debilitating course, [plaintiff] is unable to work.   Her disabilities are permanent, and will not improve to the point that she will be able to return to any type of gainful employment."   (Tr. 300).

Plaintiff was seen for follow-up on October 24, 2011 for back pain, fibromyalgia, neck pain, and depression.   Her examination was unchanged and Dr. Jarrett opined that plaintiff was "quite disabled" and not expected to improve.   (Tr. 299).

On October 30, 2011, Dr. Jarrett completed a Multiple Impairment Questionnaire on plaintiff's behalf.   (Tr. 291-98).   Dr. Jarrett listed plaintiff's diagnoses as chronic low back pain,

chronic left hip pain, fibromyalgia, depression, and chronic headaches and in support cited to clinical findings of multiple areas of tenderness in the neck, thoracic spine, and lumbosacral spine and the results from the cervical spine MRI showing disc disease. (Tr. 291). Plaintiff's prognosis was noted as "poor." (*Id*.). Plaintiff's primary symptoms were reported as dull to occasionally severe and sharp low back/mid-back pain, aching neck pain on the left, dull and sharp bilateral shoulder pain, severe fatigue and tiredness, severe and dull migraine headaches, and left hip pain. (Tr. 292). Dr. Jarrett rated plaintiff's low back pain and mid/upper back pain as moderately severe, eight on a 10-point scale, and her shoulder pain as severe, 10 on a 10-point scale. (Tr. 293). Plaintiff's fatigue was rated as moderately severe, seven to eight on a 10-point scale. (*Id.*). Dr. Jarrett opined plaintiff was able to sit three hours total and stand/walk one hour total in an eight-hour workday. She also needed to get up and move around every 30 minutes when sitting and not sit again for five to 10 minutes. (Tr. 293-94). Dr. Jarrett further opined that plaintiff could occasionally lift and carry up to 20 pounds, but she had significant limitations in performing repetitive reaching, handling, fingering, and lifting due to fatigue and pain. (Tr. 294). Dr. Jarrett found that plaintiff was markedly limited from using her upper extremities for reaching and moderately limited from using the upper extremities for fine manipulations. (Tr. 295). Dr. Jarrett reported that plaintiff's medications caused fatigue and that she had also been treated with physical therapy, multiple spine injections, water therapy, and chiropractic treatment. (*Id.*). Dr. Jarrett assessed that plaintiff would experience an increase of symptoms if placed in a competitive work environment and her pain, fatigue, or other symptoms were constantly severe enough to interfere with attention and concentration. (Tr. 295-96). Dr. Jarrett further reported that depression contributed to plaintiff's symptoms and functional

limitations.   (Tr. 296).   Dr. Jarrett opined that plaintiff required unscheduled breaks to rest

every 20 minutes for five to 10 minutes each time and estimated that plaintiff would miss work

more than three times a month as a result of her impairments or treatment.   (Tr. 296-97).   Dr.

Jarrett further opined that plaintiff had additional psychological limitations and was precluded

from pushing, pulling, kneeling, bending, and stooping.   (Tr. 297).

In a letter dated November 16, 2011, Dr. Jarrett reported that plaintiff had been under his

care for many years and "began several years ago having increasing problems with migraine

headaches that eventually combined with chronic neck pain, depression and disabling back pain."

(Tr. 290).   Dr. Jarrett stated:

> Her present diagnoses include chronic low back pain, chronic cervical neck pain,
> migraine headaches, major depression and fibromyalgia. She has undergone
> thorough evaluations by multiple physicians and her diagnoses have been
> confirmed and have been aggressively treated.   Her physical exams show poor
> range of motion of her cervical neck as well as her lower back.   She has chronic
> tenderness in both her neck and her lower back.   She has scoliosis of her thoracic
> back.
>
> She is presently on Cymbalta for depression and Tramadol ER for her chronic
> pain.   We have attempted physical therapy and spinal injections, all unfortunately
> have failed to keep her pain controlled to the point where she would be able to
> return to work.   Her office visits occur every two to six months and more often if
> needed.   The medications prescribed often have failed to control her pain and
> because of the chronic pain we have had some additional difficulty treating her
> depression.   She is a nurse and has been in a very stressful environment which
> affects her medical condition even more intensely.   She is now limited to very
> low stress situations, no prolonged standing, walking or prolonged sitting.
>
> Her prognosis for recovery is quite poor.   It is important to note that since I have
> taken her off work in August of 2011, she has had intermittent slight improvement
> in her pain and as a positive she has had no further worsening of her pain.   I do
> not feel she could ever return to full time competitive work in any working
> conditions.   Her disability is permanent.

(Tr. 290).

11

In December 2011, Dr. Hodges examined plaintiff again.  (Tr. 319-20).  Plaintiff had 5/5 strength in all extremities and her deep tendon reflexes were preserved and intact throughout the upper extremities as well as the patella and the Achilles.  (Tr. 319).  Reflexes were absent at the left hamstring, obtainable at the right; straight leg raising was positive on the left and negative on the right; hip range of motion was intact; and Patrick's test was negative.  (*Id*.).  Dr. Hodges noted that x-rays indicated spondylosis in the low back.  (*Id*.).  Dr. Hodges diagnosed left hip pain, L5 lumbar radiculitis; lumbar spondylosis, question overriding disc protrusion; and fibromyalgia syndrome.  (*Id*.).

After reviewing the record in February 2012, state agency physician, Lynne Torello, M.D., opined that plaintiff could lift, carry, push, and pull up to 20 pounds occasionally and 10 pounds frequently; sit about six hours in an eight-hour work day; and stand and/or walk about two hours in an eight-hour work day.  (Tr. 76).  Dr. Torello also found that plaintiff could frequently climb ramps/stairs, stoop, kneel, crawl and crouch, and occasionally climb ladders/rope/scaffolds.  (*Id.*).  Dr. Torello based plaintiff's postural limitations on plaintiff's fibromyalgia.  (Tr. 76-77).  Dr. Torello found plaintiff was only partially credible, noting that plaintiff's most recent examination showed she has full strength and good range of motion.  (Tr. 75).  Leanne Bertani, M.D., a state agency physician, reviewed the record in August 2012 upon reconsideration and affirmed Dr. Torello's assessment as to plaintiff's exertional limitations. (Tr. 88-89).

At a September 4, 2012 follow-up with Dr. Jarrett, plaintiff reported problems with tingling in her hands, thigh weakness, and burning in her feet.  On examination, plaintiff exhibited a positive Tinel's and Phalen's on the right and possibly decreased sensation in the

12

feet. Dr. Jarrett diagnosed paresthesias in the feet and carpal tunnel syndrome on the right and very mildly on the left. (Tr. 353). On April 4, 2013, plaintiff complained of pain in her feet and examination revealed tenderness in the right medial heel area and much less on the left; Dr. Jarrett diagnosed plantar fasciitis. (Tr. 352). On April 30, 2013, plaintiff was seen for "mood issues," fatigue, tearfulness, and anger. Dr. Jarrett diagnosed depression and prescribed psychotropic medication. (Tr. 351).

On June 4, 2013, Dr. Jarrett wrote a third opinion letter. Dr. Jarrett reiterated plaintiff's symptoms of back, neck, shoulder, and hip pain, daily headaches, severe fatigue, and migraine headaches. Dr. Jarrett opined that plaintiff's "symptoms and functional limitations are reasonably consistent with her physical impairments." (Tr. 358). Dr. Jarrett reported that plaintiff's pain occurs on a daily basis. He rated her low back pain as an eight out of ten, mid/upper back pain as an eight out of ten, shoulder pain as a ten out of ten, and fatigue as a seven to eight out of ten. He opined that plaintiff could sit for three hours and stand/walk for one hour in an eight-hour work day and he did "not medically recommend for [plaintiff] to sit, stand, or walk continuously in a work setting." (*Id*.). He further opined that if sitting, plaintiff would need to get up every 30 minutes for five to 10 minutes before sitting again. Dr. Jarrett found that plaintiff was significantly limited in her ability to do repetitive reaching, handling, fingering, and lifting, and markedly limited in her ability to use her arms for reaching, including overhead. Dr. Jarrett noted that plaintiff's prognosis was "quite poor" and that she has had intermittent and slight improvement since he took her off work in August 2011. Dr. Jarrett stated that plaintiff "is not a malingerer" and he re-endorsed his opinion as set forth in the

13

October 2011 Multiple Impairment Questionnaire and narrative report of November 2011. (Tr. 358-59).

The ALJ determined that Dr. Jarrett's November 2011 opinion that plaintiff was unable to do sedentary work (Tr. 290) was "not even remotely supported" by the record. (Tr. 27). The ALJ stated that "[a]lthough there are many complaints of pain, there is very little objective evidence and [the ALJ] did not note any recitation of tender points with regard to establishment of the fibromyalgia condition." (*Id*.). The ALJ further stated that there was no evidence supporting a need for plaintiff to refrain from activities or regular exercise, which the ALJ noted is often prescribed as treatment for fibromyalgia. (*Id*.). With respect to Dr. Jarrett's June 2013 letter (Tr. 358-59) wherein Dr. Jarrett listed major depression as a diagnosis, the ALJ noted that there was no evidence Dr. Jarrett treated plaintiff for depression specifically until April 2013. (*Id*.). The ALJ also noted that Dr. Jarrett was not a mental health professional and that "it is unclear if he is aware of the precise diagnostic criteria for" a diagnosis of depression. (*Id*.). The ALJ contrasted Dr. Jarrett's reports of plaintiff's ongoing severe low back and hip pain with the normal to mild objective x-ray findings. (*Id*.). Despite referencing this objective evidence, the ALJ stated that she was considering the reports of pain as part of plaintiff's fibromyalgia syndrome. (*Id*.). The ALJ also discussed the length of Dr. Jarrett and plaintiff's treatment relationship, noting that although it "may be true" that they treated together since 1999, the record "is not indicative that this was any type of extensive treating relationship (including no indications he referred her to specialists)." (Tr. 28). The ALJ determined that "[d]ue to the lack of support for Dr. Jarrett's allegations, no controlling or deferential weight is given to his opinion beyond the restrictions of the residual functional capacity" formulated by the ALJ. (*Id*.).

14

The only other physicians to opine on plaintiff's functional capacity were the non-examining state agency physicians.   The ALJ did not assign a specific weight to the opinions of the state agency consultants but adopted their findings in formulating plaintiff's RFC with the exception of their finding that plaintiff could stand and/or walk for a total of six hours in an eight-hour work day.   *See* Tr. 24, 76, 88-89.

Plaintiff contends the ALJ's decision to discount Dr. Jarrett's opinions lacks substantial support in the record and requires a remand of this matter.   Plaintiff claims the ALJ erred by focusing on the lack of objective findings supporting Dr. Jarrett's conclusions because plaintiff's fibromyalgia diagnosis is not readily evaluated through traditional objective testing.   (Doc. 7 at 12).   Plaintiff asserts the ALJ erred by not giving controlling weight to the opinions of her long-time treating physician as they are consistent with and supported by the evidence of record. In addition, plaintiff contends the ALJ's reasons for discounting Dr. Jarrett's opinions, *i.e.*, the extent of the treatment relationship and absence of referrals to specialists, lack substantial support in the record.   Plaintiff also argues the ALJ erred by adopting the findings of the non-examining state agency physicians as their opinions were based on incomplete reviews of the record.

The Commissioner argues the ALJ reasonably considered the lack of evidence supporting plaintiff's fibromyalgia, including "no recitation of tender points in the medical records to establish plaintiff's fibromyalgia."   (Doc. 10 at 3, citing Tr. 27).   The Commissioner states the ALJ properly relied on the "little objective evidence there was in the record regarding plaintiff's diagnosis of fibromyalgia" and gave plaintiff the benefit of the doubt by limiting her to light work with additional postural limitations.   (Doc. 10 at 3, citing Tr. 24, 26-27).   The

15

Commissioner also contends the ALJ reasonably considered the infrequency of treatment in weighing Dr. Jarrett's opinion for her medical impairments.

*(1) Analysis of disability claims related to fibromyalgia*

The Sixth Circuit has explained that fibromyalgia "causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances." *Preston v. Sec'y of Health and Human Services*, 854 F.2d 815, 817 (6th Cir. 1988). Social Security Ruling (SSR) 12-2p, which provides guidance on how the agency both develops "evidence to establish that a person has a medically determinable impairment of fibromyalgia" and evaluates fibromyalgia in disability claims, describes fibromyalgia as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months."[3] SSR 12-2p, 2012 WL 3017612 (July 25, 2012). "[D]isability claims related to fibromyalgia are related to the *symptoms* associated with the condition - including complaints of pain, stiffness, fatigue, and inability to concentrate - rather than the underlying condition itself." *Kalmbach v. Commissioner of Social Security*, 409 F. App'x 852, 862 (6th Cir. 2011) (emphasis in original) (citing *Rogers,* 486 F.3d at 247) (citing 20 C.F.R. § 416.929); *Wyatt v. Sec'y of Health & Human Servs.,* 974 F.2d 680, 686 (6th Cir. 1992) (noting that subjective complaints of pain may support a claim for disability)). *See also* SSR 12-2p (listing among the diagnostic criteria for fibromyalgia a history of widespread pain and other symptoms including manifestations of fatigue, waking unrefreshed, anxiety disorder, and irritable bowel syndrome).

---

[3] "Social Security Rulings do not have the force and effect of law, but are 'binding on all components of the Social Security Administration' and represent 'precedent final opinions and orders and statements of policy and interpretations' adopted by the Commissioner." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 273, n. 1 (6th Cir. 2010) (quoting 20 C.F.R. § 402.35(b)(1)). SSR 12-2p became effective and thus "binding" on the Administration on July 25, 2012.

The Sixth Circuit has recognized that fibromyalgia is not amenable to objective diagnosis and standard clinical tests such as x-rays and CT scans are "not highly relevant in diagnosing [fibromyalgia][4] or its severity." *Preston*, 854 F.2d at 820. The Court in *Preston* explained: "In stark contrast to the unremitting pain of which [fibromyalgia] patients complain, physical examinations will usually yield normal results - a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion and testing of certain 'focal tender points' on the body for acute tenderness which is characteristic in [fibromyalgia] patients." *Id*. at 817-18. Other courts have likewise recognized that fibromyalgia can be disabling even in the absence of objectively measurable signs and symptoms. *Reardon v. Prudential Ins. Co. of America,* No. 1:05cv178, 2007 WL 894475, *14 (S.D. Ohio March 21, 2007) (citing *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) (fibromyalgia is a "disabling impairment" that can qualify an individual for disability payments even though "there are no objective tests which can conclusively confirm the disease."); *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) ("[Fibromyalgia's] cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia."); *Swain v. Comm'r of Soc. Sec*., 297 F.Supp.2d 986, 990 (N.D. Ohio 2003) (since the presence and severity of fibromyalgia cannot be confirmed by diagnostic testing, the treating physician's opinion must necessarily depend upon an assessment of the patient's subjective complaints).

---

[4] The Sixth Circuit in *Preston* used the term "fibrositis." The preferred term is currently fibromyalgia rather than the older terms fibrositis and fibromyositis. *See* "The Merck Manual" (17th ed. 1999), p. 481.

*(2) The ALJ's analysis of Dr. Jarrett's opinions did not comport with the governing law.*

The Court finds the ALJ erred in weighing the opinion evidence from Dr. Jarrett.   First, the ALJ's discussion of plaintiff's fibromyalgia impairment misapprehends the nature of the condition.   In weighing Dr. Jarrett's opinions and plaintiff's complaints of pain, the ALJ focused heavily on the lack of objective or diagnostic evidence supporting the limitations assigned by Dr. Jarrett.   *See* Tr. 26 ("While there are many complaints of pain, there is very little objective evidence in the record.   The objective evidence that does exist shows conditions that are mild."); Tr. 27 ("Although there are many complaints of pain, there is very little objective evidence. . . ."); Tr. 27 (Dr. Jarrett "referred to her low back and left hip pain but x-rays showed only mild findings re former and were negative re the latter."); Tr. 28 ("there is little objective evidence to support [plaintiff]'s allegations").   The ALJ failed to recognize that objective tests are of little relevance in determining the existence or severity of fibromyalgia, which cannot be confirmed by objective findings.   *See Rogers*, 486 F.3d at 245 ("in light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely upon objective evidence are not particularly relevant") (citing *Preston*, 854 F.2d at 820).   *See also Kalmbach*, 409 F. App'x at 864 (the absence of objective medical evidence to substantiate the diagnosis of fibromyalgia or its severity is basically irrelevant); *Lawson v. Astrue*, 695 F. Supp.2d 729, 736 (S.D. Ohio 2010) ("Given the nature of fibromyalgia, as recognized by the Sixth Circuit, the lack of objective clinical findings or tests does not contradict [the treating physicians'] opinions on [plaintiff's] functional capacity, but rather is consistent with the entirety of the evidence.").   Indeed, the Sixth Circuit has recognized that persons suffering from fibromyalgia "manifest normal muscle strength and neurological reactions and have a full range

18

of motion."  *Preston*, 854 F.2d at 820.   The lack of objective findings to support the fibromyalgia diagnosis does not undermine the limitations assessed by Dr. Jarrett.   By focusing on the lack of objective medical data in assessing Dr. Jarrett's opinions and, by extension, plaintiff's RFC and credibility, the ALJ failed to evaluate plaintiff's fibromyalgia in accordance with Sixth Circuit precedent.

Second, the ALJ mistakenly found no evidence of "tender points" in the record to support a diagnosis of fibromyalgia.   (Tr. 27).   Contrary to the ALJ's finding, Dr. Hodges – the specialist treating plaintiff for fibromyalgia – found "15 out of 18 tender points diagnostic with two negative control points for the criteria for fibromyalgia" on examination in October 2010. (Tr. 308).   Dr. Jarrett was copied on this progress note (Tr. 309) as well as others (Tr. 307, 310), and his own notes reflect that he was aware of plaintiff's treatment with Dr. Hodges.   (Tr. 273). Dr. Jarrett's examinations also reflect "a lot of muscle tenderness in the upper back, arms, [and] chest" (Tr. 277), "a lot of tenderness in her back" (Tr. 275), tenderness in the hip, lower back, and right scapular paraspinal musculature (Tr. 273), and "[s]till a lot of tender areas in multiple areas of her back, shoulders and chest" (Tr. 272), which are fully consistent with her fibromyalgia diagnosis.   Thus, the ALJ improperly discounted Dr. Jarrett's opinions based on her erroneous conclusion that the record lacked evidence of tender points.[5]

Third, the ALJ inaccurately characterized plaintiff's treatment relationship with Dr. Jarrett.   In weighing opinion evidence from a treating medical source, ALJs are required to consider, *inter alia*, the length, nature, and extent of the treatment relationship.   20 C.F.R. §

---

[5]The ALJ stated that because there "was nothing else in the record" to explain plaintiff's pain allegations, she was giving plaintiff and Dr. Jarrett the "benefit of the doubt" with respect to plaintiff's fibromyalgia impairment. (Tr. 27).   The uncontradicted evidence from Dr. Hodges and Dr. Jarrett clearly shows that plaintiff meets the criteria for a fibromyalgia diagnosis and there is simply no support in the record for the ALJ's "doubt" on this issue.

404.1527(c)(2)(i)-(ii).   In explaining her decision to discount Dr. Jarrett's opinions, the ALJ stated "[plaintiff] rarely saw [Dr. Jarrett] so his report that he has been treating her since April 1999 may be true, but the record is not indicative that this was any type of extensive treating relationship (including no indications he referred her to any specialists)."   (Tr. 27-28).   Dr. Jarrett acted as plaintiff's primary care physician since 1999 and saw her every two to six months.   (Tr. 291).   Contrary to the ALJ's claim, the pertinent treatment notes in the record show that Dr. Jarrett treated plaintiff for pain twelve times from February 2009 to April 2013 and had the most extensive treatment relationship with plaintiff.   Moreover, plaintiff was concurrently treating with Dr. Hodges, an orthopaedist, for her fibromyalgia and Dr. Jarrett was aware of this treatment.   Whether or not Dr. Jarrett made the specific referral to Dr. Hodge is not a basis for discounting his medical opinion.   Dr. Jarrett has been plaintiff's primary care physician for over 15 years and, therefore, the ALJ should have given his opinion greater, if not controlling, weight, as he is "the medical professional[] most able to provide a detailed, longitudinal picture of [plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone. . . ."   20 C.F.R. § 404.1527(c)(2).

Fourth, the ALJ questioned Dr. Jarrett's opinions based on his statements that plaintiff's depression contributed to her inability to work.   (Tr. 27).   The ALJ found, "There is no evidence he actually treated her specifically for depression until the April 2013 visit."   (*Id.*).   This is simply not accurate.   Progress notes from July 2010 indicate "significant depression" for which Dr. Jarrett prescribed Cymbalta and a trial of Invega.   (Tr. 275).   Dr. Jarrett was also copied on Dr. Hodges' progress note from October 14, 2010, which diagnosed fibromyalgia

20

syndrome and "likely overlay of depression."   (Tr. 309).   In February 2011, Dr. Jarrett noted

more problems with plaintiff's mood and that plaintiff "was tearful about her mood," which

prompted "a lengthy discussion concerning that likewise."   (Tr. 273).   He noted plaintiff was on

Cymbalta 60 mg. and he prescribed Abilify in addition for her depression.   (*Id.*).   In October

2011, Dr. Jarrett noted plaintiff was seen for continued problems with depression.   (Tr. 299).

Contrary to the ALJ's finding, it is clear Dr. Jarrett treated plaintiff for depression prior to April

2013 and this does not provide a basis for discounting Dr. Jarrett's opinions.

The ALJ's justifications for discounting Dr. Jarrett's opinions are not supported by

substantial evidence and do not constitute "good reasons" for the weight given to the treating

physician.   *Wilson*, 378 F.3d at 545-46.   It is undisputed that plaintiff suffers from fibromyalgia.

The ALJ made a factual finding at Step Two of the sequential evaluation process that plaintiff's

fibromyalgia is a severe impairment under the Social Security regulations.   Once the ALJ made

a factual finding that plaintiff suffers from the severe impairment of fibromyalgia, it was

incumbent upon the ALJ to apply the correct legal standard for evaluating this impairment and

not discount the opinions of plaintiff's treating physician based on the lack of "objective"

evidence and the other reasons posited by the ALJ.   The ALJ's decision in this regard is not

supported by substantial evidence and this matter should be remanded for reevaluation of

plaintiff's fibromyalgia impairment and the weight to be given to Dr. Jarrett's opinions.

In addition, the ALJ erred by essentially adopting the findings of the non-examining state

agency physicians because their opinions were not based on a complete review of the record.

Non-examining state agency physician Dr. Torello reviewed plaintiff's medical records on

February 2, 2012.   (Tr. 80).   The Disability Determination Explanation form indicates that Dr.

Torello's opinion was based only on her review of Dr. Jarrett's treatment notes from February and April 2011; it is unclear what evidence non-examining state agency physician Dr. Bertani reviewed in formulating her August 2012 opinion but it is clear she did not review Dr. Jarrett's 2013 treatment notes. *See* Tr. 73, 88-89. It is also clear neither Dr. Torello nor Dr. Bertani reviewed Dr. Jarrett's narrative reports or functional assessment. (Tr. 78, 84, 85, 90-91). This is therefore not a case where the non-examining, reviewing physicians' opinions are based on a review of the complete case record. *Blakley*, 581 F.3d at 409. *See also Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 642 (6th Cir. 2013). As explained by the *Brooks* Court, "[w]hen an ALJ relies on a non-examining source who did not have the opportunity to review later submitted medical evidence, especially when that evidence reflects ongoing treatment, we generally require some indication that the ALJ at least considered these [new] facts before giving greater weight to an opinion that is not based on a review of a complete case record." *Id*. (internal quotation marks and citations omitted). Here, the state agency reviewers did not have the opportunity to review the entire medical record and they lacked the benefit of all of the medical notes, records and narrative reports from Dr. Jarrett. In addition, the ALJ did not assign any specific weight to the non-examining state agency opinions but simply adopted their limitations while including "[a]dditional limitations . . . to address [plaintiff]'s specific impairments." *See* Tr. 26. Without some explanation of the reasons underlying her decision to partially credit the opinions of the state agency consultants, the ALJ's decision to credit their opinions over those of plaintiff's long-time treating physician lacks substantial support in the record.

### b.  Weight to the opinions of the mental health sources

On January 20, 2012, plaintiff began mental health counseling with June Nelson, LISW, LPCC.  (Tr. 336).   Plaintiff reported increased irritability, staying in bed "a lot" and withdrawing.  (*Id.*).   On mental status examination, plaintiff exhibited a depressed mood with consistent affect, limited insight, and poor attention/concentration.   She also complained of extreme fatigue.  (Tr. 334).   Ms. Nelson diagnosed plaintiff with a dysthymic disorder and assigned her a Global Assessment of Functioning (GAF)[6] score of 50.   (Tr. 335).

When seen on February 3, 2012, plaintiff reported being under a lot of stress.   (Tr. 339).   At plaintiff's final visit with Ms. Nelson on February 17, 2012, she was feeling "really down and tearful" twice a day.   Plaintiff reported feelings of worthlessness, being overwhelmed, and depression.  (Tr. 337).

On March 8, 2013, after seeing plaintiff on the above three occasions, Ms. Nelson completed a Psychiatric/Psychological Impairment Questionnaire.  (Tr. 342-49).   Ms. Nelson opined that plaintiff was markedly limited in her ability to complete a normal workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and travel to unfamiliar places or use public transportation.  (Tr. 344-46).   Ms. Nelson found plaintiff was moderately limited in her ability to make simple work related decisions and to respond appropriately to changes in the work setting.   (Tr. 344-45).   Ms. Nelson concluded that

---

[6]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000).   The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning."  *Id.*   The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  *Id.* at 34.   Individuals with GAF scores of 41-50 are classified as having serious symptoms or serious impairment in social, occupational, or school functioning.  *Id.* at 32.

plaintiff was incapable of tolerating even low stress work.   (Tr. 348).   Ms. Nelson noted that the following symptoms supported her opinion: mood disturbance; social withdrawal or isolation; decreased energy; anhedonia or pervasive loss of interests; psychomotor agitation or retardation; generalized persistent anxiety; feelings of guilt/worthlessness; and difficulty thinking or concentrating.   (Tr. 343).   Plaintiff's primary symptoms were fatigue, feelings of guilt/worthlessness, social isolation, and an inability to complete daily tasks.   (Tr. 344).

In February 2012, consultative examining psychologist David Chiappone, Ph.D., evaluated plaintiff for disability purposes.   (Tr. 322-27).   On mental status examination, plaintiff was cooperative and polite; her speech was normal; she did not appear to be depressed or anxious during the evaluation; and her eye contact was good although she was slightly pessimistic.   (Tr. 324).   Plaintiff reported depression, hopelessness, disturbed sleep, decreased energy, loss of interests, and crying spells.   (*Id.*).   On testing, plaintiff remembered one of three objects with interference; three of three objects with a five minute delay; and five digits forward and backward.   (Tr. 325).   She was fully oriented, alert, and responsive; she had rapid work pace; she put forth adequate effort and persistence; and her concentration and attention were adequate.   (*Id.*).   Dr. Chiappone diagnosed a depressive disorder and assigned her a GAF score of 51.[7]   (Tr. 326).   Dr. Chiappone opined that plaintiff might have difficulty remembering information and maintaining attention and concentration over time; she could relate adequately to others; and she would have difficulty dealing with stress on a job.   (Tr. 326-27).

On March 5, 2012, state agency psychologist Caroline Lewin, Ph.D., reviewed the record and opined that plaintiff had moderate restrictions in her activities of daily living; mild

---

[7]Individuals with GAF scores of 51-60 are classified as are classified as having "moderate" symptoms. Diagnostic and Statistical Manual of Mental Disorders at 32.

difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of extended duration.   (Tr. 74).   Dr. Lewin gave weight to Dr. Chiappone's opinion.   (Tr. 75).   Dr. Lewin concluded that plaintiff would have difficulty handling stress due to concerns about her general welfare and would have difficulty handling frequent changes in the work setting.   (Tr. 78).   State agency psychologist Katherine Fernandez, Psy.D., reviewed the record in August 2012 upon reconsideration and affirmed Dr. Lewin's assessment.   (Tr. 86-87).

The ALJ gave "no significant weight" to Ms. Nelson's opinion finding that "[t]here is minimal psychological evidence and no basis for any of the marked limitations suggested by [Ms.] Nelson, who saw [plaintiff] a total of three times in early 2012."   (Tr. 28) (citation omitted).   The ALJ noted that there was no evidence plaintiff ever treated with a psychological medical source and she did not receive medication for depression specifically until 2013.   (*Id*.). The ALJ found that "[t]he minimal attempt at treatment by [plaintiff] is inconsistent with an individual alleging a disabling mental impairment.   There is nothing to suggest more than the moderate limitations as suggested by [Dr. Chiappone] and the [state agency] psychologists, all of whom are mental health professionals."   (*Id*.).

Plaintiff argues the ALJ erred in weighing the mental health opinion evidence.   Plaintiff contends that although Ms. Nelson is not an "acceptable medical source," the ALJ was nevertheless required to consider and weigh her opinion "within the framework of the treating physician rule, with the exception of the controlling weight provision."   (Doc. 7 at 15, citing 20 C.F.R. §§ 404.1513, 404.1527(a)(2)).   Plaintiff further contends that the ALJ's decision to reject Ms. Nelson's findings of "marked limitations" for lack of psychiatric medical treatment or

25

medications fails to take into account her testimony that she could not afford this treatment, which cannot be held against her pursuant to Social Security Ruling (SSR) 82-59.   (*Id.* at 15-16, citing Tr. 55-56).   Plaintiff also claims the ALJ erred in this regard because Dr. Jarrett prescribed Abilify for plaintiff starting in 2011.   (*Id.* at 16, citing Tr. 273).   Plaintiff asserts Ms. Nelson's opinion should have been afforded greater weight because Ms. Nelson treated plaintiff regularly over a period of time and her opinion was supported by references to plaintiff's symptomology, which was consistent with the other evidence of record.   (*Id.*).   Plaintiff further argues the ALJ erred in relying on the findings of the non-examining state agency psychologists because they did not review Ms. Nelson's treatment notes prior to tendering their opinions.   (*Id.*).

The ALJ appropriately considered Ms. Nelson's opinion as required by 20 C.F.R. § 404.1513(d) and substantial evidence supports her determination that it was not entitled to significant weight.   Ms. Nelson treated plaintiff on only three occasions over the course of one month.   This is not "regular treatment over a period of time" as plaintiff contends.   *See* Doc. 7 at 16.   Further, Ms. Nelson opined that plaintiff was "incapable of even 'low stress,'" but when asked she failed to explain the basis for this conclusion.   *See* Tr. 348.   Given Ms. Nelson's failure to explain this extreme finding, it was reasonable for the ALJ to not give significant weight to her opinion.

In addition, the marked limitations found by Ms. Nelson are inconsistent with the findings of Dr. Chiappone, who is the only "acceptable" mental health medical source who had the opportunity to examine plaintiff.   While Ms. Nelson opined that plaintiff was unable to work due to her inability to handle even "low stress" and was markedly limited in her ability to interact with the general public (Tr. 345, 348-49), Dr. Chiappone found that plaintiff was cooperative and

26

could relate adequately to others and though she would have difficulty dealing with stress at work, Dr. Chiappone did not opine that this limitation would preclude all work activity.   (Tr. 326-27).   Given the limited nature of Ms. Nelson's treatment relationship with plaintiff and the inconsistency between her opinion and that of Dr. Chiappone, it was reasonable for the ALJ to discount Ms. Nelson's findings.

Moreover, the ALJ was not required to give any special credence to Ms. Nelson's opinion as counselors are not "acceptable medicals sources."   Only "acceptable medical sources" as defined under 20 C.F.R. § 404.1513(a) can provide evidence which establishes the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight.   SSR 06-03p.[8]   Although information from "other sources" cannot establish the existence of a medically determinable impairment, the information "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."   *Id.*   Factors to be considered in evaluating opinions from "other sources" who have seen the claimant in their professional capacities include how long the source has known the individual, how frequently the source has seen the individual, how consistent the opinion of the source is with other evidence, how well the source explains the opinion, and whether the source has a specialty or area of expertise related to the individual's impairment.   *Id.   See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). Not every factor will apply in every case.   SSR 06-03p.   The ALJ here appropriately considered Ms. Nelson's opinion as "other source" evidence and found that it was not entitled to significant

---

[8]SSR 06-03p provides that the Commissioner will consider all available evidence in an individual's case record, including evidence from medical sources.   The term "medical sources" refers to both "acceptable medical sources" and health care providers who are not "acceptable medical sources."   *Id.* (citing 20 C.F.R. § 404.1502 and § 416.902).   Licensed physicians and licensed or certified psychologists are "acceptable medical sources."   *Id.*

weight given the her limited treatment of plaintiff and because her findings were not supported by the record as a whole.[9]   The ALJ's determination in this regard is supported by substantial evidence.

Likewise, the ALJ's decision to credit the opinions of the state agency psychologists is substantially supported.   While it is true that these medical sources did not have the opportunity to review the treatment records from Ms. Nelson before assessing plaintiff's functional limitations, their findings were based on review of Dr. Chiappone's consultative examination report and their conclusions were consistent with his opinion that plaintiff had "some", i.e., "moderate" functional limitations.   Notably, plaintiff does not argue that the ALJ erred in finding that the "moderate limitations" assessed by Dr. Chiappone accurately reflected plaintiff's functional abilities.   *See* Tr. 28.   Dr. Chiappone is the only acceptable mental health source in the record who had the opportunity to examine plaintiff and it was reasonable for the ALJ to adopt his opinion and, in turn, the opinions of the state agency reviewing psychologists whose findings were premised on Dr. Chiappone's examination report.

To the extent plaintiff argues the ALJ erred under SSR 82-59 by failing to note plaintiff's explanation for not receiving further mental health treatment due to lack of resources, the undersigned disagrees.   SSR 82-59 requires the ALJ to consider an individual's inability to afford treatment "which he or she is willing to accept, but for which free community resources are unavailable."   SSR 82-59, 1982 WL 31384, at *4 (1982).   While plaintiff testified that she

---

(citing 20 C.F.R. § 404.1513(d)(1) and § 416.913(d)).   Licensed counselors are not "acceptable medical sources" and instead fall into the category of "other sources."   *Id.* (citing 20 C.F.R. § 404.1513(d)(1) and § 416.913(d)).

[9] Although the ALJ incorrectly stated that plaintiff did not receive medication for depression until 2013, *see supra* at 20-21, the ALJ's decision to discount Ms. Nelson's opinion is nonetheless supported by substantial evidence for the reasons given.

could not afford counseling given the $75.00 co-pay required by her husband's insurance (Tr. 55-56), there is nothing in the record showing that plaintiff attempted but was unable to obtain counseling through free community resources.

For the reasons stated above, plaintiff's first assignment of error should be sustained in part.   The ALJ erred in weighing the opinion evidence from plaintiff's treating physician, Dr. Jarrett, and failed to give "good reasons" under *Wilson* for discounting his findings which are supported by and consistent with the medical evidence of record.   This matter should therefore be remanded with instructions to the ALJ to reweigh the evidence from Dr. Jarrett consistent with this opinion.   In contrast, the ALJ's decision to discount the opinion of Ms. Nelson, plaintiff's treating counselor, is substantially supported by the record and should be affirmed.

2. <u>Whether the ALJ erred in assessing plaintiff's credibility</u>.

The ALJ found that plaintiff's "statements concerning her impairments and their impact on her ability to work are inconsistent with the record as a whole and not entirely credible."   (Tr. 25).   In support, the ALJ cited to the minimal fibromyalgia treatment in the record, plaintiff's testimony and reports showing that "she is capable of a fairly wide range of activities of daily living," and the minimal findings in the objective evidence which the ALJ found did not support plaintiff's claims of disabling pain.   (Tr. 25-26).   Plaintiff argues, *inter alia*, that the ALJ erred in discounting her credibility based on a lack of medical findings supporting her claims of pain given the unique nature of her fibromyalgia impairment.   (Doc. 7 at 16-18).

It is not necessary to address plaintiff's credibility argument because the ALJ's reconsideration of this matter on remand may impact the remainder of the ALJ's sequential analysis, including the assessment of plaintiff's credibility.   *See Trent v. Astrue*, No.

1:09cv2680, 2011 WL 841538, at *7 (N.D. Ohio Mar. 8, 2011).   In any event, even if this assignment of error had merit, the result would be the same, i.e., a remand for further proceedings and not outright reversal for benefits.

**III. This matter should be reversed and remanded for further proceedings.**

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the Court notes that all essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of her alleged onset date.   *Faucher v. Sec'y of H.H.S.,* 17 F.3d 171, 176 (6th Cir. 1994).   This matter should be reversed and remanded for further proceedings with instructions to the ALJ to re-weigh the medical opinion evidence regarding plaintiff's physical impairments in accordance with this decision, reconsider plaintiff's credibility and RFC, and further develop the medical and vocational evidence as warranted.

**IT IS THEREFORE RECOMMENDED THAT** the decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date:   8/15/15                              *s/Karen L. Litkovitz*
                                            Karen L. Litkovitz
                                            United States Magistrate Judge

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

SHERRY A. BANKS,                                      Case No. 1:14-cv-691
      Plaintiff,                                   Beckwith, J.
                                                     Litkovitz, M.J.

      vs.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.   Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.   If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.   A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.   Failure to make objections in accordance with this procedure may forfeit rights on appeal.   *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).